UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHARLES H. WURTZEBACH,                          :

                Plaintiff,           :

v.
                                  :       Civ. No.

HENDERSON GLOBAL INVESTORS,
HENDERSON GLOBAL INVESTORS                      :
(NORTH AMERICA) INC., and
HENDERSON GROUP plc                             :

            Defendants.          :       MARCH 6, 2009

## COMPLAINT

Plaintiff, Charles H. Wurtzebach, by his attorneys, Liddle & Robinson, L.L.P. and

Zeldes, Needle & Cooper, P.C. for his complaint alleges as follows:

## THE PARTIES

1.      Mr. Wurtzebach is a 59-year old male who was the founding Managing Director

of Henderson Global Investors (North America).  His date of birth is March 13, 1949.  His

current address is 240 East Illinois Street, Chicago, Illinois 60611.

2.      Henderson Global Investors is an international investment management company

headquartered in London with U.S. offices in Hartford, Connecticut and Chicago, Illinois.

3.      Henderson Global Investors (North America) Inc. is an investment adviser

registered with the U.S. Securities and Exchange Commission and is the North American

subsidiary of Henderson Global Investors, also with offices in Hartford, Connecticut and

Chicago, Illinois.

4.      Henderson Group plc is a United Kingdom limited company and the parent

company of Henderson Global Investors.

## JURISDICTION AND VENUE

5.      Jurisdiction is founded upon 28 U.S.C. § 1331 and principles of supplemental jurisdiction under 28 U.S.C. § 1367.

6.      Mr. Wurtzebach filed a Charge of Age Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 18, 2008.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(3).

## FACTS

8.      Mr. Wurtzebach joined Henderson Global Investors in April 1999 as the Managing Director and Property Chief Investment Officer for North America.  His responsibilities included, among other things, the overall management of Henderson Global Investors (North America) Inc. – which he founded, oversight of all product offerings in North America and strategic planning of property portfolios.

9.      Throughout his employment with defendants (collectively "Henderson"), Mr. Wurtzebach was qualified for his position and performed his duties in a professional and competent manner.

10.     Under Mr. Wurtzebach's management since the North American entity's inception, the assets under management of Henderson Global Investors (North America) Inc. have increased by more than 14 times their initial value.

11.     During his tenure, Mr. Wurtzebach chaired Henderson's North American Property Investment and Management Committees, and he sat as a member of the Portfolio Performance Committee and Henderson's Global Senior Management Team.

12.     When he was not traveling, Mr. Wurtzebach split his time equally between Henderson's Hartford and Chicago offices.

13.     Throughout his employment, Mr. Wurtzebach reported to Roger Yates, Managing Director of Henderson Global Investors and, since June 2003, Chief Executive of Henderson Group plc. Upon information and belief, Mr. Yates, who worked in London, is in his early 50s.

14.     As part of Mr. Wurtzebach's mid-year 2007 performance review, Mr. Yates asked Mr. Wurtzebach to begin thinking about succession planning for his position. Mr. Wurtzebach followed up in writing in August 2007 to advise Mr. Yates that, although he would provide a succession plan as requested, it was Mr. Wurtzebach's firm intention to continue working at Henderson until mid-2012.

15.     Andrew Boorman, Head of Human Resources for Henderson Global Investors and Henderson Group plc, advised Mr. Wurtzebach in mid-2007 that Mr. Yates would likely expect that he intended to retire at age 60 because that was the approach among the English generally and at Henderson in particular.

16.     Despite Mr. Wurtzebach's representation concerning his planned tenure with Henderson, Mr. Yates continued to inquire about the timing of Mr. Wurtzebach's retirement and to discuss the potential succession of Sean Dranfield (age 42), one of Mr. Wurtzebach's direct reports, to his role.

17.     Mr. Yates prepared Mr. Wurtzebach's 2007 year-end performance review, which rated him as "Exceeds Expectations" and noted that "Overall 2007 was an excellent year for the North American business with revenues, profits and the cost/income ratio well ahead of what was a fairly stretching plan."

18.     On or about January 21, 2008, Mr. Wurtzebach and Mr. Yates met in London. In the context of suggesting that Mr. Dranfield and Mr. Wurtzebach work together as co-heads of North America, Mr. Yates asked Mr. Wurtzebach what his "lifestyle interests" were, saying he did

3

"not want this to look like an ageist thing." He further suggested that they consider changing Mr. Wurtzebach's title to "President or something" and that Mr. Wurtzebach take on a more strategic role. Mr. Yates asked whether Mr. Wurtzebach wanted to continue to work 12-hour days, and Mr. Wurtzebach reiterated his desire to continue working for at least the next several years.

19.     On or about August 19, 2008, Mr. Yates and Mr. Wurtzebach spoke via videoconference regarding Mr. Wurtzebach's mid-year performance review. Mr. Yates had informed Mr. Wurtzebach earlier that month that he would be leaving Henderson later in the year and stated in this conversation that he planned to do so because he was "tired." Mr. Yates then inquired how long Mr. Wurtzebach intended to continue working at Henderson, to which Mr. Wurtzebach replied approximately three to five years. Mr. Yates went on to compliment Mr. Wurtzebach on the success he and his team had achieved in North America.

20.     Andrew Formica, formerly Head of Equities for Henderson Global Investors, replaced Mr. Yates effective November 2008. Upon information and belief, Mr. Formica, who also worked in London, is in his early 40s.

21.     On or about September 9, 2008, Mr. Formica met with Mr. Wurtzebach and questioned how long Mr. Wurtzebach intended to continue working. Mr. Wurtzebach told Mr. Formica that he expected to remain at Henderson for at least the next five years.

22.     On or about September 23, 2008 at a meeting in London, without warning, Mr. Formica notified Mr. Wurtzebach that his employment was terminated because there was no longer any role for him at Henderson going forward. Mr. Formica said that the decision to terminate Mr. Wurtzebach's employment was not based on performance and was not based on cause.

23.     Later that same day, Mr. Boorman told Mr. Wurtzebach that it was Mr. Formica's intention to treat him as a "good leaver" for purposes of the deferred compensation previously earned by Mr. Wurtzebach but which had not yet been released to him by the company.

24.     On or about October 21, 2008, Mr. Wurtzebach notified Mr. Boorman and Steven O'Brien, General Counsel of Henderson Global Investors, of his concern that the termination of his employment by Henderson involved issues of age discrimination.

25.     By letter dated October 24, 2008, Henderson for the first time characterized its reason for terminating Mr. Wurtzebach's employment that Mr. Wurtzebach "fundamentally disagreed with and could not support the direction in which Mr. Formica plan[ned] to take the organization." This statement is false. In fact, on or about September 9, 2008, Mr. Wurtzebach told Mr. Formica that, although he remained supportive of the firm's existing regional distribution approach, he would be happy to help Mr. Formica achieve success with the global distribution model he was proposing – an offer Mr. Wurtzebach had previously extended to Mr. Yates.

26.     In that letter, also for the first time, Mr. Wurtzebach's departure from Henderson was characterized as that of an "unapproved leaver" for purposes of Henderson's deferred compensation plans.

27.     Mr. Wurtzebach was placed on garden leave from Henderson for the period October 27 through November 14, 2008, at which time his employment was terminated.

28.     Upon information and belief, Mr. Wurtzebach's job responsibilities were divided among four younger employees – Arno Kitts (early to mid-40s), Sean Dranfield (42 years old), James O'Brien (early to mid-40s) and James Martha (50 years old).

29.     On or about November 14, 2008, in connection with the termination of Mr. Wurtzebach's employment, Henderson forfeited approximately 604,500 restricted shares awarded

5

to him under the Henderson Group plc Long Term Incentive Plan ("LTIP"), worth about $700,000; approximately 356,991 matching shares awarded to him under the Henderson Group plc Employee Share Ownership Plan ("ESOP"), worth about $400,000; and 23,143 restricted shares awarded to him under the Henderson Group plc Deferred Equity Plan ("DEP"), worth approximately $25,000. Had Mr. Wurtzebach been granted "good leaver status," he would have received 352,611 of the forfeited LTIP shares, all 356,991 of the forfeited ESOP shares and all 23,143 of the forfeited DEP shares, worth in total approximately $800,000.

30.     Henderson also forfeited $292,309 of deferred short-term incentive compensation awarded to Mr. Wurtzebach for the years 2005 through 2007.

31.     In addition, Henderson failed to pay Mr. Wurtzebach any short-term incentive compensation for 2008.

32.     At the outset of Mr. Wurtzebach's employment, Henderson agreed to provide Mr. Wurtzebach with total annual compensation in the form of a base salary, short-term incentive payments and long-term incentive payments. During his tenure, Henderson's policy and practice was to compensate Mr. Wurtzebach annually on a total compensation basis based on a business philosophy intended to reward him in a manner consistent with his performance and that reflected his individual contribution to the performance of the business. Mr. Wurtzebach's performance was measured, like that of other employees at Henderson, against the business plan goals allocated to him at the beginning of each fiscal year, and the company's intent was to reward him for top performance with top quartile total compensation.

33.     Mr. Wurtzebach's earned the following base salary and short-term incentive compensation during the years 2003 through 2008:

| Year | Base Salary | Short-Term Incentive Comp |
|------|-------------|---------------------------|
| 2003 | $400,000 | $189,000 |
| 2004 | $400,000 | $285,000 |
| 2005 | $400,000 | $451,518 |
| 2006 | $400,000 | $724,151 |
| 2007 | $450,000 | $826,800 |
| 2008 | $450,000 | $ 0 |

34.     As of September 30, 2008, Henderson Global Investors (North America) Inc. had generated Profit (defined as revenue less expenses but before tax) of nearly $17 million – approximately $3 million in excess of the firm's Profit budget. In addition, the ratio of expenses to revenue was seven percentage points less than what had been budgeted.

35.     In October 2008, Henderson's North American Chief Financial Officer attributed nearly 60 percent of the increase in Henderson's share price to the growth of its North American business under Mr. Wurtzebach.

36.     On February 3, 2009, Henderson indicated that a new justification for its termination of Mr. Wurtzebach's employment was Mr. Formica's decision to restructure Henderson's business model from one organized by region to a centralized global model. Under this new model, Henderson asserted, the need for a North American Managing Director position no longer existed. Henderson's latest justification for its decision to terminate Mr. Wurtzebach's employment is suspect because, among other things, Henderson did not eliminate the Managing Director position or terminate the employment of Henderson's Asian regional head, a position held by Alex Henderson, who is approximately 45 years of age. In addition, upon information and belief, James O'Brien currently holds Mr. Wurtzebach's position of Managing Director of North America.

## FIRST CLAIM

(Age Discrimination Under the ADEA)

37.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 36 as if separately set forth herein.

38.     At all relevant times, Mr. Wurtzebach was an "employee" under the ADEA, 29 U.S.C. § 630(f).

39.     Upon information and belief, Henderson is an "employer" under the ADEA, 29 U.S.C. § 630(b).

40.     By its actions detailed above, Henderson unlawfully discriminated against Mr. Wurtzebach on the basis of his age in violation of the ADEA.

41.     By reason of the foregoing, Mr. Wurtzebach suffered damages, including emotional pain and mental anguish, in an amount to be determined at trial.

42.     Upon information and belief, Henderson's conduct was willful, entitling Mr. Wurtzebach to liquidated damages pursuant to 29 U.S.C. § 626(b).

## SECOND CLAIM

(Breach of Express Contract)

43.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 42 as if separately set forth herein.

44.     Mr. Wurtzebach's forfeited restricted shares described above are governed by the LTIP, ESOP and DEP.

45.     The DEP provides in part that "any Restricted Shares ... to which the Participant is entitled shall be forfeited" "[i]n the event of the Participant ceasing to be employed by an Employing Company for any reason other than those specified in Rule 13.1 or Rule 13.2(b)...."

8

Rule 13.1 provides for the continuation of share awards where employment is terminated by reason of, among other things, "Redundancy." The DEP, incorporating by reference the Employment Act 1966 (United Kingdom), defines "Redundancy" as follows:

"[A]n employee who is dismissed shall be taken to be dismissed by reason of redundancy if the dismissal is wholly or mainly attributable to –

    (a)    the fact that his employer has ceased or intends to cease –

        (i)    to carry on the business for the purposes of which the employee was employed by him, or

        (ii)    to carry on that business in the place where the employee was so employed, or

    (b)    the fact that the requirements of that business –

        (i)    for employees to carry out work of a particular kind, or

        (ii)    for employees to carry out work of a particular kind in the place where the employee was employed by the employer,

have ceased or diminished or are expected to cease or diminish."

46.    Henderson breached the DEP by forfeiting 23,143 restricted shares upon the termination of Mr. Wurtzebach's employment.

47.    As a result of Henderson's breach of the DEP, Mr. Wurtzebach has suffered damages of approximately $25,000.

## THIRD CLAIM

(Breach of the Covenant of Good Faith and Fair Dealing)

48.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 47 as if separately set forth herein.

49.    The LTIP, ESOP and DEP each contain an implied covenant of good faith and fair dealing requiring that Henderson do nothing to injure Mr. Wurtzebach's right to receive the benefits of those contracts.

50.    Henderson had an obligation to exercise good faith when determining whether to grant Mr. Wurtzebach "good leaver" status under the LTIP, ESOP and DEP.

51.    Henderson failed to exercise good faith in characterizing Mr. Wurtzebach as an "unapproved leaver" for purposes of the LTIP, ESOP and DEP.

52.    As a result of Henderson's breach of the implied covenant of good faith and fair dealing, Mr. Wurtzebach has been harmed in the approximate amount of $800,000.

## FOURTH CLAIM

(Breach of Implied Contract)

53.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 52 as if separately set forth herein.

54.    An implied contract arose between Henderson and Mr. Wurtzebach as to short-term incentive compensation.

55.    Henderson indicated by its representations, conduct, policies and practices that a substantial portion of Mr. Wurtzebach's annual compensation would be paid in the form of short-term incentive compensation.

56.     Mr. Wurtzebach relied upon Henderson's representations, conduct, policies and practices in rendering services to Henderson in 2008, thereby accepting Henderson's offer of short-term incentive compensation as described above.

57.     In spite of the foregoing, Henderson failed to pay Mr. Wurtzebach any short-term incentive compensation for 2008.

58.     Henderson, without cause, unlawfully breached the implied agreement between the parties by refusing to pay Mr. Wurtzebach any short-term incentive compensation for 2008.

59.     Henderson's unlawful breach of the agreement has caused Mr. Wurtzebach to suffer damages in an amount to be determined.

## FIFTH CLAIM

### (Unjust Enrichment)

60.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 59 as if separately set forth herein.

61.     Henderson benefitted from the services provided by Mr. Wurtzebach during 2008.

62.     Henderson did not pay Mr. Wurtzebach for the benefit he conveyed in 2008 because it failed to pay him any short-term incentive compensation for that year.

63.     Henderson's failure to pay Mr. Wurtzebach short-term incentive compensation for 2008 has caused him to suffer monetary harm in an amount to be determined.

## SIXTH CLAIM

### (Quantum Meruit)

64.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 63 as if separately set forth herein.

65.     Mr. Wurtzebach provided services to Henderson during 2008 that generated a substantial amount of revenue for the firm.

66.     Henderson accepted and benefited from Mr. Wurtzebach's services and his successful efforts to generate revenue for the firm.

67.     Mr. Wurtzebach expected to be paid for such services and efforts, and Henderson was aware of this fact.

68.     Notwithstanding the foregoing, Henderson failed and refused to pay Mr. Wurtzebach any short-term incentive compensation for his services during 2008.

69.     Henderson's retention of the benefit of Mr. Wurtzebach's services would be unjust. Therefore, Henderson should be required to pay Mr. Wurtzebach the reasonable value of the services he provided to the firm during 2008, such amount to be determined.

## SEVENTH CLAIM

(Violation of Connecticut General Statutes § 31-72)

70.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 69 as if separately set forth herein.

71.     The short term incentive compensation that Henderson failed to pay Mr. Wurtzebach for 2008 constitutes "wages" within the meaning of C.G.S. § 31-71a(3).

72.     By refusing to pay Mr. Wurtzebach the short term incentive compensation for 2008, Henderson unreasonably and arbitrarily withheld wages from Mr. Wurtzebach in violation of C.G.S. § 31-71e.

73.     As a result of Henderson's actions, Mr. Wurtzebach has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      On his First Claim, back pay and front pay (including benefits and deferred compensation) in amounts to be determined at trial, liquidated damages, attorneys' fees, costs and interest;

B.      On his Second Claim, compensatory damages in an amount not less than $25,000, plus interest;

C.      On his Third Claim, compensatory damages in an amount not less than $800,000, plus interest;

D.      On his Fourth Claim, compensatory damages in an amount to be determined, plus interest;

E.      On his Fifth Claim, compensatory damages in an amount to be determined, plus interest;

F.      On his Sixth Claim, compensatory damages in an amount equal to the reasonable value of services provided by plaintiff, plus interest;

G.      On his Seventh Claim, compensatory damages in an amount to be determined, plus

double damages pursuant to C.G.S. § 31-72, plus attorney fees and costs pursuant to C.G.S. § 31-

72, plus interest; and

H.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims triable to a jury.

Sarah W. Poston (ct19702)

Zeldes, Needle & Cooper, P.C.
1000 Lafayette Blvd., Suite 500
Bridgeport, CT 06604
Tel.: (203) 333-9441
Fax: (203) 333-1489
Email: sposton@znclaw.com

Marc A. Susswein, Esq.
Christine A. Palmieri, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, New York 10022
Tel.: (212) 687-8500
Fax:  (212) 687-1505

Attorneys for Plaintiff